(Slip Opinion) OCTOBER TERM, 2011 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## MESSERSCHMIDT ET AL. *v.* MILLENDER, EXECUTOR OF ESTATE OF MILLENDER, DECEASED, ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 10–704.   Argued December 5, 2011—Decided February 22, 2012

Shelly Kelly was afraid that she would be attacked by her boyfriend, Jerry Ray Bowen, while she moved out of her apartment. She therefore requested police protection. Two officers arrived, but they were called away to an emergency. As soon as the officers left, Bowen showed up at the apartment, yelled "I told you never to call the cops on me bitch!" and attacked Kelly, attempting to throw her over a second-story landing. After Kelly escaped to her car, Bowen pointed a sawed-off shotgun at her and threatened to kill her if she tried to leave. Kelly nonetheless sped away as Bowen fired five shots at the car, blowing out one of its tires.

Kelly later met with Detective Curt Messerschmidt to discuss the incident. She described the attack in detail, mentioned that Bowen had previously assaulted her, that he had ties to the Mona Park Crips gang, and that he might be staying at the home of his former foster mother, Augusta Millender. Following this conversation, Messerschmidt conducted a detailed investigation, during which he confirmed Bowen's connection to the Millenders' home, verified his membership in two gangs, and learned that Bowen had been arrested and convicted for numerous violent and firearm-related offenses. Based on this investigation, Messerschmidt drafted an application for a warrant authorizing a search of the Millenders' home for all firearms and ammunition, as well as evidence indicating gang membership.

Messerschmidt included two affidavits in the warrant application. The first detailed his extensive law enforcement experience and his specialized training in gang-related crimes. The second, expressly incorporated into the search warrant, described the incident and ex-

plained why Messerschmidt believed there was probable cause for the search. It also requested that the warrant be endorsed for night service because of Bowen's gang ties. Before submitting the application to a magistrate for approval, Messerschmidt had it reviewed by his supervisor, Sergeant Robert Lawrence, as well as a police lieutenant and a deputy district attorney. Messerschmidt then submitted the application to a magistrate, who issued the warrant. The ensuing search uncovered only Millender's shotgun, a California Social Services letter addressed to Bowen, and a box of .45-caliber ammunition.

The Millenders filed an action under 42 U. S. C. §1983 against petitioners Messerschmidt and Lawrence, alleging that the officers had subjected them to an unreasonable search in violation of the Fourth Amendment. The District Court granted summary judgment to the Millenders, concluding that the firearm and gang-material aspects of the search warrant were overbroad and that the officers were not entitled to qualified immunity from damages. The Ninth Circuit, sitting en banc, affirmed the denial of qualified immunity. The court held that the warrant's authorization was unconstitutionally overbroad because the affidavits and warrant failed to establish probable cause that the broad categories of firearms, firearm-related material, and gang-related material were contraband or evidence of a crime, and that a reasonable officer would have been aware of the warrant's deficiency.

*Held:* The officers are entitled to qualified immunity. Pp. 8–19.

(a) Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson* v. *Callahan*, 555 U. S. 223, 231. Where the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner, or in "objective good faith." *United States* v. *Leon*, 468 U. S. 897, 922–923. Nonetheless, that fact does not end the inquiry into objective reasonableness. The Court has recognized an exception allowing suit when "it is obvious that no reasonably competent officer would have concluded that a warrant should issue." *Malley* v. *Briggs*, 475 U. S. 335, 341. The "shield of immunity" otherwise conferred by the warrant, *id.*, at 345, will be lost, for example, where the warrant was "based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Leon*, 468 U. S., at 923. The threshold for establishing this exception is high. "[I]n the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination" because "[i]t is the magistrate's responsi-

bility to determine whether the officer's allegations establish proba-
ble cause and, if so, to issue a warrant comporting in form with the
requirements of the Fourth Amendment." *Leon, supra*, at 921. Pp.
8−10.

(b) This case does not fall within that narrow exception. It would
not be entirely unreasonable for an officer to believe that there was
probable cause to search for all firearms and firearm-related materi-
als. Under the circumstances set forth in the warrant, an officer
could reasonably conclude that there was a "fair probability" that the
sawed-off shotgun was not the only firearm Bowen owned, *Illinois* v.
*Gates*, 462 U. S. 213, 238, and that Bowen's sawed-off shotgun was il-
legal. Cf. 26 U. S. C. §§ 5845(a), 5861(d). Given Bowen's possession
of one illegal gun, his gang membership, willingness to use the gun to
kill someone, and concern about the police, it would not be unreason-
able for an officer to conclude that Bowen owned other illegal guns.
An officer also could reasonably believe that seizure of firearms was
necessary to prevent further assaults on Kelly. California law allows
a magistrate to issue a search warrant for items "in the possession of
any person with the intent to use them as a means of committing a
public offense," Cal. Penal Code Ann. §1524(a)(3), and the warrant
application submitted by the officers specifically referenced this pro-
vision as a basis for the search. Pp. 10–12.

(c) Regarding the warrant's authorization to search for gang-
related materials, a reasonable officer could view Bowen's attack as
motivated not by the souring of his romantic relationship with Kelly
but by a desire to prevent her from disclosing details of his gang ac-
tivity to the police. It would therefore not be unreasonable—based on
the facts set out in the affidavit—for an officer to believe that evi-
dence of Bowen's gang affiliation would prove helpful in prosecuting
him for the attack on Kelly, in supporting additional, related charges
against Bowen for the assault, or in impeaching Bowen or rebutting
his defenses. Moreover, even if this were merely a domestic dispute,
a reasonable officer could still conclude that gang paraphernalia
found at the Millenders' residence could demonstrate Bowen's control
over the premises or his connection to other evidence found there.
Pp. 12−16.

(d) The fact that the officers sought and obtained approval of the
warrant application from a superior and a deputy district attorney
before submitting it to the magistrate provides further support for
the conclusion that an officer could reasonably have believed that the
scope of the warrant was supported by probable cause. A contrary
conclusion would mean not only that Messerschmidt and Lawrence
were "plainly incompetent" in concluding that the warrant was sup-
ported by probable cause, *Malley*, *supra*, at 341, but that their super-

Syllabus

visor, the deputy district attorney, and the magistrate were as well. Pp. 16−18.

(e) In holding that the warrant in this case was so obviously defective that no reasonable officer could have believed it to be valid, the court below erred in relying on *Groh* v. *Ramirez*, 540 U. S. 551. There, officers who carried out a warrant-approved search were not entitled to qualified immunity because the warrant failed to describe any of the items to be seized and "even a cursory reading of the warrant" would have revealed this defect. *Id.,* at 557. Here, in contrast, any arguable defect would have become apparent only upon a close parsing of the warrant application, and a comparison of the supporting affidavit to the terms of the warrant to determine whether the affidavit established probable cause to search for all the items listed in the warrant. Unlike in *Groh*, any error here would not be one that "just a simple glance" would have revealed. *Id.* at 564. Pp. 18−19.

620 F. 3d 1016, reversed.

ROBERTS, C. J., delivered the opinion of the Court, in which SCALIA, KENNEDY, THOMAS, BREYER, and ALITO, JJ., joined. BREYER, J., filed a concurring opinion. KAGAN, J., filed an opinion concurring in part and dissenting in part. SOTOMAYOR, J., filed a dissenting opinion, in which GINSBURG, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

### No. 10–704

## CURT MESSERSCHMIDT, ET AL., PETITIONERS v. BRENDA MILLENDER, AS EXECUTOR OF THE ESTATE OF AUGUSTA MILLENDER, DECEASED, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[February 22, 2012]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

Petitioner police officers conducted a search of respondents' home pursuant to a warrant issued by a neutral magistrate. The warrant authorized a search for all guns and gang-related material, in connection with the investigation of a known gang member for shooting at his ex-girlfriend with a pistol-gripped sawed-off shotgun, because she had "call[ed] the cops" on him. App. 56. Respondents brought an action seeking to hold the officers personally liable under 42 U. S. C. §1983, alleging that the search violated their Fourth Amendment rights because there was not sufficient probable cause to believe the items sought were evidence of a crime. In particular, respondents argued that there was no basis to search for all guns simply because the suspect owned and had used a sawed-off shotgun, and no reason to search for gang material because the shooting at the ex-girlfriend for "call[ing] the cops" was solely a domestic dispute. The Court of

Appeals for the Ninth Circuit held that the warrant was invalid, and that the officers were not entitled to immunity from personal liability because this invalidity was so obvious that any reasonable officer would have recognized it, despite the magistrate's approval.  We disagree and reverse.

I

A

Shelly Kelly decided to break off her romantic relationship with Jerry Ray Bowen and move out of her apartment, to which Bowen had a key.  Kelly feared an attack from Bowen, who had previously assaulted her and had been convicted of multiple violent felonies.  She therefore asked officers from the Los Angeles County Sheriff's Department to accompany her while she gathered her things. Deputies from the Sheriff's Department came to assist Kelly but were called away to respond to an emergency before the move was complete.

As soon as the officers left, an enraged Bowen appeared at the bottom of the stairs to the apartment, yelling "I told you never to call the cops on me bitch!"  App. 39, 56. Bowen then ran up the stairs to Kelly, grabbed her by her shirt, and tried to throw her over the railing of the second-story landing.  When Kelly successfully resisted, Bowen bit her on the shoulder and attempted to drag her inside the apartment by her hair.  Kelly again managed to escape Bowen's grasp, and ran to her car.  By that time, Bowen had retrieved a black sawed-off shotgun with a pistol grip. He ran in front of Kelly's car, pointed the shotgun at her, and told Kelly that if she tried to leave he would kill her. Kelly leaned over, fully depressed the gas pedal, and sped away.  Bowen fired at the car a total of five times, blowing out the car's left front tire in the process, but Kelly managed to escape.

Kelly quickly located police officers and reported the

assault. She told the police what had happened—that Bowen had attacked her after becoming "angry because she had called the Sheriff's Department"—and she mentioned that Bowen was "an active member of the 'Mona Park Crips,'" a local street gang. *Id.*, at 39. Kelly also provided the officers with photographs of Bowen.

Detective Curt Messerschmidt was assigned to investigate the incident. Messerschmidt met with Kelly to obtain details of the assault and information about Bowen. Kelly described the attack and informed Messerschmidt that she thought Bowen was staying at his foster mother's home at 2234 East 120th Street. Kelly also informed Messerschmidt of Bowen's previous assaults on her and of his gang ties.

Messerschmidt then conducted a background check on Bowen by consulting police records, California Department of Motor Vehicles records, and the "cal-gang" database. Based on this research, Messerschmidt confirmed Bowen's connection to the 2234 East 120th Street address. He also confirmed that Bowen was an "active" member of the Mona Park Crips and a "secondary" member of the Dodge City Crips. *Id.*, at 64. Finally, Messerschmidt learned that Bowen had been arrested and convicted for numerous violent and firearm-related offenses. Indeed, at the time of the investigation, Bowen's "rapsheet" spanned over 17 printed pages, and indicated that he had been arrested at least 31 times. Nine of these arrests were for firearms offenses and six were for violent crimes, including three arrests for assault with a deadly weapon (firearm). *Id.*, at 72–81.

Messerschmidt prepared two warrants: one to authorize Bowen's arrest and one to authorize the search of 2234 East 120th Street. An attachment to the search warrant described the property that would be the object of the search:

"All handguns, rifles, or shotguns of any caliber, or any firearms capable of firing ammunition, or firearms or devices modified or designed to allow it [*sic*] to fire ammunition. All caliber of ammunition, miscellaneous gun parts, gun cleaning kits, holsters which could hold or have held any caliber handgun being sought. Any receipts or paperwork, showing the purchase, ownership, or possession of the handguns being sought. Any firearm for which there is no proof of ownership. Any firearm capable of firing or chambered to fire any caliber ammunition.

"Articles of evidence showing street gang membership or affiliation with any Street Gang to include but not limited to any reference to 'Mona Park Crips', including writings or graffiti depicting gang membership, activity or identity. Articles of personal property tending to establish the identity of person [*sic*] in control of the premise or premises. Any photographs or photograph albums depicting persons, vehicles, weapons or locations, which may appear relevant to gang membership, or which may depict the item being sought and or believed to be evidence in the case being investigated on this warrant, or which may depict evidence of criminal activity. Additionally to include any gang indicia that would establish the persons being sought in this warrant, affiliation or membership with the 'Mona Park Crips' street gang." *Id.,* at 52.

Two affidavits accompanied Messerschmidt's warrant applications. The first affidavit described Messerschmidt's extensive law enforcement experience, including that he had served as a peace officer for 14 years, that he was then assigned to a "specialized unit" "investigating gang related crimes and arresting gang members for various violations of the law," that he had been involved in "hun-

dreds of gang related incidents, contacts, and or arrests" during his time on the force, and that he had "received specialized training in the field of gang related crimes" and training in "gang related shootings." *Id.,* at 53–54.

The second affidavit—expressly incorporated into the search warrant—explained why Messerschmidt believed there was sufficient probable cause to support the warrant. That affidavit described the facts of the incident involving Kelly and Bowen in great detail, including the weapon used in the assault. The affidavit recounted that Kelly had identified Bowen as the assailant and that she thought Bowen might be found at 2234 East 120th Street. It also reported that Messerschmidt had "conducted an extensive background search on the suspect by utilizing departmental records, state computer records, and other police agency records," and that from that information he had concluded that Bowen resided at 2234 East 120th Street. *Id.,* at 58.

The affidavit requested that the search warrant be endorsed for night service because "information provided by the victim and the cal-gang data base" indicated that Bowen had "gang ties to the Mona Park Crip gang" and that "night service would provide an added element of safety to the community as well as for the deputy personnel serving the warrant." *Id.,* at 59. The affidavit concluded by noting that Messerschmidt "believe[d] that the items sought" would be in Bowen's possession and that "recovery of the weapon could be invaluable in the successful prosecution of the suspect involved in this case, and the curtailment of further crimes being committed." *Ibid.*

Messerschmidt submitted the warrants to his supervisors—Sergeant Lawrence and Lieutenant Ornales—for review. Deputy District Attorney Janet Wilson also reviewed the materials and initialed the search warrant, indicating that she agreed with Messerschmidt's assessment of probable cause. *Id.*, at 27, 47. Finally, Messer-

schmidt submitted the warrants to a magistrate. The magistrate approved the warrants and authorized night service.

The search warrant was served two days later by a team of officers that included Messerschmidt and Lawrence. Sheriff's deputies forced open the front door of 2234 East 120th Street and encountered Augusta Millender—a woman in her seventies—and Millender's daughter and grandson. As instructed by the police, the Millenders went outside while the residence was secured but remained in the living room while the search was conducted. Bowen was not found in the residence. The search did, however, result in the seizure of Augusta Millender's shotgun, a California Social Services letter addressed to Bowen, and a box of .45-caliber ammunition.

Bowen was arrested two weeks later after Messerschmidt found him hiding under a bed in a motel room.

B

The Millenders filed suit in Federal District Court against the County of Los Angeles, the sheriff's department, the sheriff, and a number of individual officers, including Messerschmidt and Lawrence. The complaint alleged, as relevant here, that the search warrant was invalid under the Fourth Amendment. It sought damages from Messerschmidt and Lawrence, among others.

The parties filed cross motions for summary judgment on the validity of the search warrant. The District Court found the warrant defective in two respects. The District Court concluded that the warrant's authorization to search for firearms was unconstitutionally overbroad because the "crime specified here was a physical assault with a very specific weapon"—a black sawed-off shotgun with a pistol grip—negating any need to "search for all firearms." *Millender* v. *County of Los Angeles*, Civ. No. 05–2298 (CD Cal., Mar. 15, 2007), App. to Pet. for Cert.

106, 157, 2007 WL 7589200, *21. The court also found the warrant overbroad with respect to the search for gang-related materials, because there "was no evidence that the crime at issue was gang-related." App. to Pet. for Cert. 157. As a result, the District Court granted summary judgment to the Millenders on their constitutional challenges to the firearm and gang material aspects of the search warrant. *Id.,* at 160. The District Court also rejected the officers' claim that they were entitled to qualified immunity from damages. *Id.,* at 171.

Messerschmidt and Lawrence appealed, and a divided panel of the Court of Appeals for the Ninth Circuit reversed the District Court's denial of qualified immunity. 564 F. 3d 1143 (2009). The court held that the officers were entitled to qualified immunity because "they reasonably relied on the approval of the warrant by a deputy district attorney and a judge." *Id.*, at 1145.

The Court of Appeals granted rehearing en banc and affirmed the District Court's denial of qualified immunity. 620 F. 3d 1016 (CA9 2010). The en banc court concluded that the warrant's authorization was unconstitutionally overbroad because the affidavit and the warrant failed to "establish[ ] probable cause that the broad categories of firearms, firearm-related material, and gang-related material described in the warrant were contraband or evidence of a crime." *Id.,* at 1033. In the en banc court's view, "the deputies had probable cause to search for a single, identified weapon . . . . They had no probable cause to search for the broad class of firearms and firearm-related materials described in the warrant." *Id.,* at 1027. In addition, "[b]ecause the deputies failed to establish any link between gang-related materials and a crime, the warrant authorizing the search and seizure of all gang-related evidence [was] likewise invalid." *Id.,* at 1031. Concluding that "a reasonable officer in the deputies' position would have been well aware of this deficiency,"

the en banc court held that the officers were not entitled to qualified immunity. *Id.,* at 1033–1035.

There were two separate dissenting opinions. Judge Callahan determined that "the officers had probable cause to search for and seize any firearms in the home in which Bowen, a gang member and felon, was thought to reside." *Id.,* at 1036. She also concluded that "the officers reasonably relied on their superiors, the district attorney, and the magistrate to correct" any overbreadth in the warrant, and that the officers were entitled to qualified immunity because their actions were not objectively unreasonable. *Id.,* at 1044, 1049. Judge Silverman also dissented, concluding that the "deputies' belief in the validity of . . . the warrant was entirely reasonable" and that the "record [wa]s totally devoid of any evidence that the deputies acted other than in good faith." *Id.,* at 1050. Judge Tallman joined both dissents.

We granted certiorari. 564 U. S. ___ (2011).

II

The Millenders allege that they were subjected to an unreasonable search in violation of the Fourth Amendment because the warrant authorizing the search of their home was not supported by probable cause. They seek damages from Messerschmidt and Lawrence for their roles in obtaining and executing this warrant. The validity of the warrant is not before us. The question instead is whether Messerschmidt and Lawrence are entitled to immunity from damages, even assuming that the warrant should not have been issued.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson* v. *Callahan*, 555 U. S. 223, 231 (2009) (quoting *Harlow* v. *Fitzgerald*, 457 U. S. 800,

818 (1982)).  Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments," and "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft* v. *al-Kidd*, 563 U. S. \_\_\_, \_\_\_ (2011) (slip op., at 12) (quoting *Malley* v. *Briggs*, 475 U. S. 335, 341 (1986)).  "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson* v. *Creighton*, 483 U. S. 635, 639 (1987) (citation omitted).

Where the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner or, as we have sometimes put it, in "objective good faith." *United States* v. *Leon*, 468 U. S. 897, 922–923 (1984).[1]  Nonetheless, under our precedents, the fact that a neutral magistrate has issued a warrant authorizing the allegedly unconstitutional search or seizure does not end the inquiry into objective reasonableness.  Rather, we have recognized an exception allowing suit when "it is obvious that no reasonably competent officer would have concluded that a warrant should issue." *Malley*, 475 U. S., at 341.  The "shield of immunity" otherwise conferred by the warrant, *id.*, at 345, will be lost, for example, where the warrant was "based on an affidavit so lacking in indicia of probable cause as to render official belief in its exist-

───────────
[1] Although *Leon* involved the proper application of the exclusionary rule to remedy a Fourth Amendment violation, we have held that "the same standard of objective reasonableness that we applied in the context of a suppression hearing in *Leon* defines the qualified immunity accorded an officer" who obtained or relied on an allegedly invalid warrant. *Malley* v. *Briggs*, 475 U. S. 335, 344 (1986) (citation omitted); *Groh* v. *Ramirez*, 540 U. S. 551, 565, n. 8 (2004).

ence entirely unreasonable." *Leon*, 468 U. S., at 923 (internal quotation marks omitted).[2]

Our precedents make clear, however, that the threshold for establishing this exception is a high one, and it should be. As we explained in *Leon*, "[i]n the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination" because "[i]t is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment." *Id.*, at 921; see also *Malley*, *supra*, at 346, n. 9 ("It is a sound presumption that the magistrate is more qualified than the police officer to make a probable cause determination, and it goes without saying that where a magistrate acts mistakenly in issuing a warrant but within the range of professional competence of a magistrate, the officer who requested the warrant cannot be held liable" (internal quotation marks and citation omitted)).

## III

The Millenders contend, and the Court of Appeals held, that their case falls into this narrow exception. According to the Millenders, the officers "failed to provide *any* facts or circumstances from which a magistrate could properly conclude that there was probable cause to seize the broad classes of items being sought," and "[n]o reasonable officer

---

[2] The dissent relies almost entirely on facts outside the affidavit, including Messerschmidt's deposition testimony, *post*, at 4, 11 (opinion of SOTOMAYOR, J.), crime analysis forms, *post*, at 5, Kelly's interview, *post*, at 5–6, and n. 5, Messerschmidt's notes regarding Kelly's interview, *post*, at 5–6, n. 5, and even several briefs filed in the District Court and the Court of Appeals, *post*, at 8–9, 12. In contrast, the dissent cites the probable cause affidavit itself *only twice*. See *post*, at 12. There is no contention before us that the affidavit was misleading in omitting any of the facts on which the dissent relies. Cf. *Leon*, 468 U. S., at 923.

would have presumed that such a warrant was valid." Brief for Respondents 27. We disagree.

A

With respect to the warrant's authorization to search for and seize all firearms, the Millenders argue that "a reasonably well-trained officer would have readily perceived that there was no probable cause to search the house for *all* firearms and firearm-related items." *Id.*, at 32. Noting that "the affidavit indicated exactly what item was evidence of a crime—the 'black sawed off shotgun with a pistol grip,'" they argue that "[n]o facts established that Bowen possessed any other firearms, let alone that such firearms (if they existed) were 'contraband or evidence of a crime.'" *Ibid.* (quoting App. 56).

Even if the scope of the warrant were overbroad in authorizing a search for all guns when there was information only about a specific one, that specific one was a sawed-off shotgun with a pistol grip, owned by a known gang member, who had just fired the weapon five times in public in an attempt to murder another person, on the asserted ground that she had "call[ed] the cops" on him. *Id.*, at 56. Under these circumstances—set forth in the warrant—it would not have been unreasonable for an officer to conclude that there was a "fair probability" that the sawed-off shotgun was not the only firearm Bowen owned. *Illinois* v. *Gates*, 462 U. S. 213, 238 (1983). And it certainly would have been reasonable for an officer to assume that Bowen's sawed-off shotgun was illegal. Cf. 26 U. S. C. §§5845(a), 5861(d). Evidence of one crime is not always evidence of several, but given Bowen's possession of one illegal gun, his gang membership, his willingness to use the gun to kill someone, and his concern about the police, a reasonable officer could conclude that there would be additional illegal guns among others that Bowen

owned.[3]

A reasonable officer also could believe that seizure of the firearms was necessary to prevent further assaults on Kelly. California law allows a magistrate to issue a search warrant for items "in the possession of any person with the intent to use them as a means of committing a public offense," Cal. Penal Code Ann. §1524(a)(3) (West 2011), and the warrant application submitted by the officers specifically referenced this provision as a basis for the search. App. 48. Bowen had already attempted to murder Kelly once with a firearm, and had yelled "I'll kill you" as she tried to escape from him. *Id.,* at 56–57. A reasonable officer could conclude that Bowen would make another attempt on Kelly's life and that he possessed other firearms "with the intent to use them" to that end. Cal. Penal Code Ann. §1524(a)(3).

Given the foregoing, it would not have been "entirely unreasonable" for an officer to believe, in the particular circumstances of this case, that there was probable cause to search for all firearms and firearm-related materials. *Leon*, *supra*, at 923 (internal quotation marks omitted).

With respect to the warrant's authorization to search for evidence of gang membership, the Millenders contend that "no reasonable officer could have believed that the affidavit presented to the magistrate contained a sufficient basis to conclude that the gang paraphernalia sought was contraband or evidence of a crime." Brief for Respondents 28. They argue that "the magistrate [could not] have reasonably concluded, based on the affidavit, that Bowen's gang membership had anything to do with the crime under investigation" because "[t]he affidavit described a 'spousal

—————

[3] The dissent caricatures our analysis as being that "because Bowen fired one firearm, it was reasonable for the police to conclude . . . that [he] must have possessed others," *post*, at 10 (opinion of SOTOMAYOR, J.). This simply avoids coming to grips with the facts of the crime at issue.

assault' that ensued after Kelly decided to end her 'on going dating relationship' with Bowen" and "[n]othing in that description suggests that the crime was gang-related." *Ibid.* (quoting App. 55).

This effort to characterize the case solely as a domestic dispute, however, is misleading. Cf. *post*, at 5 (SOTOMAYOR, J., dissenting); *post*, at 2 (KAGAN, J., concurring in part and dissenting in part). Messerschmidt began his affidavit in support of the warrant by explaining that he "has been investigating an assault with a deadly weapon incident" and elaborated that the crime was a "spousal assault *and* an assault with a deadly weapon." App. 55 (emphasis added). The affidavit also stated that Bowen was "a known Mona Park Crip gang member" "based on information provided by the victim and the cal-gang database,"[4] and that he had attempted to murder Kelly after becoming enraged that she had "call[ed] the cops on [him]." *Id.*, at 56, 58–59. A reasonable officer could certainly view Bowen's attack as motivated not by the souring of his romantic relationship with Kelly but instead by a desire to prevent her from disclosing details of his gang activity to the police. She was, after all, no longer linked with him as a girlfriend; he had assaulted her in the past; and she had indeed called the cops on him. And, as the affidavit supporting the warrant made clear, Kelly had in fact given the police information about Bowen's gang ties. *Id.*, at 59.[5]

---

[4] Although the cal-gang database states that information contained therein cannot be used to establish probable cause, see App. 64, the affidavit makes clear that Kelly also provided this information to Messerschmidt, *id.*, at 59, as she did to the deputies who initially responded to the attack, *id.,* at 39 (describing Kelly's statement that Bowen was "an active member of the 'Mona Park Crips'"). We therefore need not decide whether the cal-gang database's disclaimer is relevant to Fourth Amendment analysis.

[5] Contrary to the dissent's suggestion, see *post*, at 5–6, n. 5 (opinion of SOTOMAYOR, J.), the affidavit's account of Bowen's statements is

It would therefore not have been unreasonable—based on the facts set out in the affidavit—for an officer to believe that evidence regarding Bowen's gang affiliation would prove helpful in prosecuting him for the attack on Kelly. See *Warden, Md. Penitentiary* v. *Hayden*, 387 U. S. 294, 307 (1967) (holding that the Fourth Amendment allows a search for evidence when there is "probable cause . . . to believe that the evidence sought will aid in a particular apprehension or conviction"). Not only would such evidence help to establish motive, either apart from or in addition to any domestic dispute, it would also support the bringing of additional, related charges against Bowen for the assault. See, *e.g.,* Cal. Penal Code Ann. §136.1(b)(1) (West 1999) (It is a crime to "attempt[ ] to prevent or dissuade another person who has been the victim of a crime or who is witness to a crime from . . . [m]aking any report of that victimization to any . . . law enforcement officer").[6]

––––––––––

consistent with other accounts of the confrontation, in particular the report prepared by the officers who spoke with Kelly immediately after the attack. See App. 39 (stating that when Bowen "appeared at the base of the stairs and began yelling at [Kelly,] [h]e was angry because she had called the Sheriff's Department"). And at no point during this litigation has the accuracy of the affidavit's account of the attack been called into question.

[6] The dissent relies heavily on Messerschmidt's deposition, in which he stated that Bowen's crime was not a "gang crime." See *post*, at 4–7. Messerschmidt's belief about the nature of the crime, however, is not *information* he possessed but a *conclusion* he reached based on information known to him. See *Anderson* v. *Creighton*, 483 U. S. 635, 641 (1987). We have "eschew[ed] inquiries into the subjective beliefs of law enforcement officers who seize evidence pursuant to a subsequently invalidated warrant." *United States* v. *Leon*, 468 U. S. 897, 922, n. 23 (1984); see also *Harlow* v. *Fitzgerald*, 457 U. S. 800, 815–819 (1982). In any event, as the dissent recognizes, the inquiry under our precedents is whether "a reasonably well-trained officer in petitioner's position would have known that *his affidavit* failed to establish probable cause." *Malley*, 475 U. S., at 345 (emphasis added). Messerschmidt's own evaluation does not answer the question whether it would have been

In addition, a reasonable officer could believe that evidence demonstrating Bowen's membership in a gang might prove helpful in impeaching Bowen or rebutting various defenses he could raise at trial. For example, evidence that Bowen had ties to a gang that uses guns such as the one he used to assault Kelly would certainly be relevant to establish that he had familiarity with or access to this type of weapon.

Moreover, even if this were merely a domestic dispute, a reasonable officer could still conclude that gang paraphernalia found at the Millenders' residence would aid in the prosecution of Bowen by, for example, demonstrating Bowen's connection to other evidence found there. The warrant authorized a search for "any gang indicia that would establish the persons being sought in this warrant," and "[a]rticles of personal property tending to establish the identity of [the] person in control of the premise or premises." App. 52. Before the District Court, the Millenders "acknowledge[d] that evidence of who controlled the premises would be relevant if incriminating evidence were found and it became necessary to tie that evidence to a person," and the District Court approved that aspect of the warrant on this basis. App. to Pet. for Cert. 158–159 (internal quotation marks omitted). Given Bowen's known gang affiliation, a reasonable officer could conclude that gang paraphernalia found at the residence would be an effective means of demonstrating Bowen's control over the premises or his connection to evidence found there.[7]

—————

unreasonable for an officer to have reached a different conclusion from the facts in the affidavit. See n. 2, *supra*.

[7] The Fourth Amendment does not require probable cause to believe evidence will *conclusively* establish a fact before permitting a search, but only "probable cause . . . to believe the evidence sought *will aid* in a particular apprehension or conviction." *Warden, Md. Penitentiary* v. *Hayden*, 387 U. S. 294, 307 (1967) (emphasis added). Even if gang evidence might have turned out not to be conclusive because other

Whatever the use to which evidence of Bowen's gang involvement might ultimately have been put, it would not have been "entirely unreasonable" for an officer to believe that the facts set out in the affidavit established a fair probability that such evidence would aid the prosecution of Bowen for the criminal acts at issue. *Leon*, 468 U. S*.,* at 923 (internal quotation marks omitted).

B

Whether any of these facts, standing alone or taken together, actually establish probable cause is a question we need not decide. Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments." *al-Kidd*, 563 U. S., at ___ (slip op., at 12). The officers' judgment that the scope of the warrant was supported by probable cause may have been mistaken, but it was not "plainly incompetent." *Malley*, 475 U. S., at 341.

On top of all this, the fact that the officers sought and obtained approval of the warrant application from a superior and a deputy district attorney before submitting it to the magistrate provides further support for the conclusion that an officer could reasonably have believed that the scope of the warrant was supported by probable cause. *Ibid.* Before seeking to have the warrant issued by a magistrate, Messerschmidt conducted an extensive investigation into Bowen's background and the facts of the crime. Based on this investigation, Messerschmidt prepared a detailed warrant application that truthfully laid

─────────

members of the Millender household also had gang ties, see *post*, at 8 (opinion of SOTOMAYOR, J.); *post*, at 2–3 (opinion of KAGAN, J.), a reasonable officer could still conclude that evidence of gang membership would help show Bowen's connection to the residence. Such evidence could, for example, have displayed Bowen's gang moniker ("C Jay") or could have been identified by Kelly as belonging to Bowen. See App. 64.

out the pertinent facts. The only facts omitted—the officers' knowledge of Bowen's arrest and conviction records, see *supra,* at 3—would only have strengthened the warrant. Messerschmidt then submitted the warrant application for review by Lawrence, another superior officer, and a deputy district attorney, all of whom approved the application without any apparent misgivings. Only after this did Messerschmidt seek the approval of a neutral magistrate, who issued the requested warrant. The officers thus "took every step that could reasonably be expected of them." *Massachusetts* v. *Sheppard,* 468 U. S. 981, 989 (1984). In light of the foregoing, it cannot be said that "no officer of reasonable competence would have requested the warrant." *Malley,* 475 U. S., at 346, n. 9. Indeed, a contrary conclusion would mean not only that Messerschmidt and Lawrence were "plainly incompetent," *id.,* at 341, but that their supervisor, the deputy district attorney, and the magistrate were as well.

The Court of Appeals, however, gave no weight to the fact that the warrant had been reviewed and approved by the officers' superiors, a deputy district attorney, and a neutral magistrate. Relying on *Malley,* the court held that the officers had an "independent responsibility to ensure there [was] at least a colorable argument for probable cause." 620 F. 3d, at 1034. It explained that "[t]he deputies here had a responsibility to exercise their reasonable professional judgment," and that "in circumstances such as these a neutral magistrate's approval (and, a fortiori, a non-neutral prosecutor's) cannot absolve an officer of liability." *Ibid.* (citation omitted).

We rejected in *Malley* the contention that an officer is automatically entitled to qualified immunity for seeking a warrant unsupported by probable cause, simply because a magistrate had approved the application. 475 U. S., at 345. And because the officers' superior and the deputy district attorney are part of the prosecution team, their

review also cannot be regarded as dispositive. But by holding in *Malley* that a magistrate's approval does not automatically render an officer's conduct reasonable, we did not suggest that approval by a magistrate or review by others is irrelevant to the objective reasonableness of the officers' determination that the warrant was valid. Indeed, we expressly noted that we were not deciding "whether [the officer's] conduct in [that] case was in fact objectively reasonable." *Id.*, at 345, n. 8. The fact that the officers secured these approvals is certainly pertinent in assessing whether they could have held a reasonable belief that the warrant was supported by probable cause.

C

In holding that the warrant in this case was so obviously defective that no reasonable officer could have believed it was valid, the court below relied heavily on our decision in *Groh* v. *Ramirez*, 540 U. S. 551 (2004), but that precedent is far afield. There, we held that officers who carried out a warrant-approved search were not entitled to qualified immunity because the warrant in question failed to describe the items to be seized *at all*. *Id.,* at 557. We explained that "[i]n the portion of the form that called for a description of the 'person or property' to be seized, [the applicant] typed a description of [the target's] two-story blue house rather than the alleged stockpile of firearms." *Id.,* at 554. Thus, the warrant stated nonsensically that "'there is now concealed [on the specified premises] a certain person or property, namely [a] single dwelling residence two story in height which is blue in color and has two additions attached to the east.'" *Id.,* at 554–555, n. 2 (bracketed material in original). Because "even a cursory reading of the warrant in [that] case—perhaps just a simple glance—would have revealed a glaring deficiency that any reasonable police officer would have known was constitutionally fatal," *id.,* at 564, we held that

the officer was not entitled to qualified immunity.

The instant case is not remotely similar. In contrast to *Groh*, any defect here would not have been obvious from the face of the warrant. Rather, any arguable defect would have become apparent only upon a close parsing of the warrant application, and a comparison of the affidavit to the terms of the warrant to determine whether the affidavit established probable cause to search for all the items listed in the warrant. This is not an error that "just a simple glance" would have revealed. *Ibid.* Indeed, unlike in *Groh*, the officers here did not merely submit their application to a magistrate. They also presented it for review by a superior officer, and a deputy district attorney, before submitting it to the magistrate. The fact that none of the officials who reviewed the application expressed concern about its validity demonstrates that any error was not obvious. *Groh* plainly does not control the result here.

\* \* \*

The question in this case is not whether the magistrate erred in believing there was sufficient probable cause to support the scope of the warrant he issued. It is instead whether the magistrate so obviously erred that any reasonable officer would have recognized the error. The occasions on which this standard will be met may be rare, but so too are the circumstances in which it will be appropriate to impose personal liability on a lay officer in the face of judicial approval of his actions. Even if the warrant in this case were invalid, it was not so obviously lacking in probable cause that the officers can be considered "plainly incompetent" for concluding otherwise. *Malley, supra,* at 341. The judgment of the Court of Appeals denying the officers qualified immunity must therefore be reversed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

———————

No. 10–704

———————

CURT MESSERSCHMIDT, ET AL., PETITIONERS *v.*
BRENDA MILLENDER, AS EXECUTOR OF THE
ESTATE OF AUGUSTA MILLENDER,
DECEASED, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[February 22, 2012]

JUSTICE BREYER, concurring.

The Court concludes that the officers acted reasonably in searching the house for "'all firearms and firearm-related items.'" *Ante,* at 11–12 (emphasis deleted). In support of this conclusion, it cites two sets of circumstances. First, the majority points to "Bowen's possession of one illegal gun, his gang membership, his willingness to use the gun to kill someone, and his concern about the police . . . ." *Ante*, at 11. Second, the majority notes that "[a] reasonable officer also could believe that seizure of the firearms was necessary to prevent further assaults on Kelly," because "Bowen had already attempted to murder Kelly once with a firearm, and had yelled 'I'll kill you' as she tried to escape from him." *Ante,* at 12. In my view, given all these circumstances together, the officers could reasonably have believed that the scope of their search was supported by probable cause. On that basis, I concur.

# SUPREME COURT OF THE UNITED STATES

_____

No. 10–704

_____

CURT MESSERSCHMIDT, ET AL., PETITIONERS *v.*
BRENDA MILLENDER, AS EXECUTOR OF THE
ESTATE OF AUGUSTA MILLENDER,
DECEASED, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[February 22, 2012]

JUSTICE KAGAN, concurring in part and dissenting in part.

Both the Court and the dissent view this case as an all-or-nothing affair: The Court awards immunity across the board to Messerschmidt and his colleagues, while the dissent would grant them none at all. I think the right answer lies in between, although the Court makes the more far-reaching error.

I agree with the Court that a reasonably competent police officer could have thought this warrant valid in authorizing a search for all firearms and related items. See *ante*, at 11–12. The warrant application recounted that a known gang member had used a sawed-off shotgun—an illegal weapon under California law, see Cal. Penal Code Ann. §33215 (West 2012 Cum. Supp.)—to try to kill another person. See App. 56–57, 59. Perhaps gang ties plus possession of an unlawful gun plus use of that gun to commit a violent assault do not add up to what was needed for this search: probable cause to believe that Bowen had additional illegal firearms (or legal firearms that he intended to use to violate the law) at the place he was staying. But because our and the Ninth Circuit's decisions leave that conclusion debatable, a reasonable

police officer could have found the warrant adequately supported by "indicia of probable cause." *Malley* v. *Briggs*, 475 U. S. 335, 345 (1986). So Messerschmidt and his fellow officers should receive qualified immunity for their search for firearms.

The Court, however, goes astray when it holds that a reasonable officer could have thought the warrant valid in approving a search for evidence of "street gang member-ship," App. 52. Membership in even the worst gang does not violate California law, so the officers could not search for gang paraphernalia just to establish Bowen's ties to the Crips. Instead, the police needed probable cause to believe that such items would provide evidence of an actual crime—and as the Court acknowledges, see *ante*, at 12–14, the only crime mentioned in the warrant applica-tion was the assault on Kelly. The problem for the Court is that nothing in the application supports a link between Bowen's gang membership and that shooting. Contra the Court's elaborate theory-spinning, see *ante*, at 12–16, Messerschmidt's affidavit in fact characterized the violent assault only as a domestic dispute, not as a gang-related one, see App. 55 (describing the crime as a "spousal as-sault and an assault with a deadly weapon"). And that description is consistent with the most natural under-standing of the events. The warrant application thus had a hole at its very center: It lacked any explanation of how gang items would (or even might) provide evidence of the domestic assault the police were investigating.

To fill this vacuum, the Court proposes an alternative, but similarly inadequate justification—that gang para-phernalia could have demonstrated Bowen's connection to the Millender residence and to any evidence of the assault found there. The dissent rightly notes one difficulty with this argument: The discovery of gang items would not have established that Bowen was staying at the house, given that several other gang members regularly did so.

See *post*, at 8–9 (opinion of SOTOMAYOR, J.). And even setting that issue aside, the Court's reasoning proves far too much: It would sanction equally well a search for *any* of Bowen's possessions on the premises—a result impossible to square with the Fourth Amendment. See, *e.g., Andresen* v. *Maryland*, 427 U. S. 463, 480 (1976) (disapproving "'a general, exploratory rummaging in a person's belongings'" (quoting *Coolidge* v. *New Hampshire*, 403 U. S. 443, 467 (1971))). In authorizing a search for all gang-related items, the warrant far outstripped the officers' probable cause. Because a reasonable officer would have recognized that defect, I would not award qualified immunity to Messerschmidt and his colleagues for this aspect of their search.

Still more fundamentally, the Court errs in scolding the Court of Appeals for failing to give "weight to the fact that the warrant had been reviewed and approved by the officers' superiors, a deputy district attorney, and a neutral magistrate." *Ante*, at 17. As the dissent points out, see *post*, at 13–15, this Court's holding in *Malley* is to the opposite effect: An officer is *not* "entitled to rely on the judgment of a judicial officer in finding that probable cause exists and hence issuing the warrant." 475 U. S., at 345. *Malley* made clear that qualified immunity turned on the officer's own "professional judgment," considered separately from the mistake of the magistrate. *Id.,* at 346; see *ibid.*, n. 9 ("The officer . . . cannot excuse his own default by pointing to the greater incompetence of the magistrate"); *id.,* at 350 (Powell, J., concurring in part and dissenting in part) (objecting to the Court's decision to "give little evidentiary weight to the finding of probable cause by a magistrate"). And what we said in *Malley* about a magistrate's authorization applies still more strongly to the approval of other police officers or state attorneys. All those individuals, as the Court puts it, are "part of the prosecution team." *Ante*, at 18. To make their

views relevant is to enable those teammates (whether acting in good or bad faith) to confer immunity on each other for unreasonable conduct—like applying for a warrant without anything resembling probable cause.

For these reasons, I would reverse in part and affirm in part the judgment of the Court of Appeals, and I would remand this case for further proceedings.

# SUPREME COURT OF THE UNITED STATES

_____

No. 10–704

_____

CURT MESSERSCHMIDT, ET AL., PETITIONERS *v.*
BRENDA MILLENDER, AS EXECUTOR OF THE
ESTATE OF AUGUSTA MILLENDER,
DECEASED, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[February 22, 2012]

JUSTICE SOTOMAYOR, with whom JUSTICE GINSBURG
joins, dissenting.

The fundamental purpose of the Fourth Amendment's
warrant clause is "to protect against all general searches."
*Go-Bart Importing Co.* v. *United States*, 282 U. S. 344, 357
(1931). The Fourth Amendment was adopted specifically
in response to the Crown's practice of using general war-
rants and writs of assistance to search "suspected places"
for evidence of smuggling, libel, or other crimes. *Boyd* v.
*United States*, 116 U. S. 616, 625–626 (1886). Early patri-
ots railed against these practices as "the worst instrument
of arbitrary power" and John Adams later claimed that
"the child Independence was born" from colonists' opposi-
tion to their use. *Id.,* at 625 (internal quotation marks
omitted).

To prevent the issue of general warrants on "loose,
vague or doubtful bases of fact," *Go-Bart Importing Co.*,
282 U. S., at 357, the Framers established the inviolable
principle that should resolve this case: "no Warrants shall
issue, but upon probable cause . . . and particularly de-
scribing the . . . things to be seized." U. S. Const., Amdt. 4.
That is, the police must articulate an adequate reason to
search for specific items related to specific crimes.

In this case, police officers investigating a specific, non-gang-related assault committed with a specific firearm (a sawed-off shotgun) obtained a warrant to search for all evidence related to "any Street Gang," "[a]ny photographs . . . which may depict evidence of criminal activity," and "any firearms." App. 52. They did so for the asserted reason that the search might lead to evidence related to other gang members and other criminal activity, and that other "[v]alid warrants commonly allow police to search for 'firearms and ammunition.'" See *infra*, at 8–9. That kind of general warrant is antithetical to the Fourth Amendment.

The Court nonetheless concludes that the officers are entitled to qualified immunity because their conduct was "objectively reasonable." I could not disagree more. All 13 federal judges who previously considered this case had little difficulty concluding that the police officers' search for any gang-related material violated the Fourth Amendment. See App. to Pet. for Cert. 28–29, 45, n. 7, 73, 94, 157–158. And a substantial majority agreed that the police's search for both gang-related material and all firearms not only violated the Fourth Amendment, but was objectively unreasonable. Like them, I believe that any "reasonably well-trained officer in petitioner's position would have known that his affidavit failed to establish probable cause." *Malley* v. *Briggs*, 475 U. S. 335, 345 (1986).

The Court also hints that a police officer's otherwise unreasonable conduct may be excused by the approval of a magistrate, or more disturbingly, another police officer. *Ante,* at 16–18. That is inconsistent with our focus on the objective reasonableness of an officer's decision to submit a warrant application to a magistrate, and we long ago rejected it. See *Malley*, 475 U. S., at 345–346.

The Court's analysis bears little relationship to the record in this case, our precedents, or the purposes under-

lying qualified immunity analysis. For all these reasons, I respectfully dissent.

## I

The Court holds that a well-trained officer could have reasonably concluded that there was probable cause to search the Millenders' residence for any evidence of affiliation with "any Street Gang," and "all handguns, rifles, or shotguns of any caliber, or any firearms capable of firing ammunition." App. 52.[1] I cannot agree.

## A

Most troubling is the Court's determination that petitioners reasonably could have concluded that they had probable cause to search for all evidence of any gang affiliation in the Millenders' home. The Court reaches this result only by way of an unprecedented, *post hoc* reconstruction of the crime that wholly ignores the police's own conclusions, as well as the undisputed facts presented to the District Court.

The Court primarily theorizes that "[a] reasonable officer could certainly view Bowen's attack as motivated not by the souring of his romantic relationship with Kelly but instead by a desire to prevent her from disclosing details of his gang activity to the police." *Ante,* at 13. The majority therefore dismisses as "misleading" the Millenders' characterization of the case as a "domestic dispute," insisting that Detective Messerschmidt could have reasonably thought that the crime was gang related. See *ante,* at 13–14.[2]

––––––––––

[1] Not even the Court defends the warrant's authorization to search for "[a]ny photographs . . . which may depict evidence of criminal activity."

[2] The Court implies Detective Messerschmidt did not consider the crime "solely . . . a domestic dispute" because he labeled it a "spousal assault *and* an assault with a deadly weapon." *Ante,* at 13 (internal quotation marks omitted). Solely domestic disputes often involve gun violence, however. See Sorenson & Weibe, Weapons in the Lives of

The police flatly rejected that hypothesis, however, con-
cluding that the crime was a domestic dispute that was
not in any way gang related. Detective Messerschmidt's
deposition is illustrative.

> "Q: So as far as you knew, it was just sort of a spousal-
> abuse-type case where the perpetrator happened to be
> in a gang, right?
> "A: Correct.
> "Q: So you didn't have any reason to believe that the
> assault on Kelly was any sort of gang crime, did you?
> "A: No." Record in No. CV 05–2298 DDP (RZx) (CD
> Cal.) (hereinafter Record), Doc. 51, (Exh. X), p. 120
> (hereinafter Deposition).[3]

The "Crime Analysis" forms prepared by the police like-

───────────

Battered Women, 94 Am. J. Pub. Health 1412, 1413 (2004) (noting
more than one-third of female domestic violence shelter residents in
California reported having been threatened or harmed with a firearm).
That was the case here. In any event, the Court's reading of Detective
Messerschmidt's affidavit is incompatible with his testimony that the
crime was "just sort of a spousal-abuse-type case," not a "gang crime."
See *supra* this page.

[3] By suggesting that courts assessing qualified immunity should ig-
nore police officers' testimony about the information they possessed at
the time of the search, *ante,* at 14–15, n. 6, the Court misreads *Harlow*
v. *Fitzgerald*, 457 U. S. 800, 815–819 (1982), and *Anderson* v.
*Creighton*, 483 U. S. 635, 645 (1987). In *Harlow*, we adopted a qualified
immunity test focusing on an officer's objective good faith, rather than
whether the officer searched "*with the malicious intention* to cause a
deprivation of constitutional rights or other injury." 457 U. S., at 815.
As we have explained, "examination of the information possessed by the
searching officials . . . does not reintroduce into qualified immunity
analysis the inquiry into officials' subjective intent that *Harlow* sought
to minimize." *Anderson*, 483 U. S., at 641. It is therefore highly
relevant that Detective Messerschmidt testified that he lacked "any
reason" to consider the crime gang related, *supra* this page, and pos-
sessed no "information" that there were handguns in the Millenders'
home, *infra,* at 11. Courts cannot ignore information in crime analysis
forms, ballistic reports, or victim interviews by labeling such infor-
mation "conclusions."

wise identified Bowen as a "Mona Park Crip" gang member, but did not check off "gang-related" as a motive for the attack. See App. 41, 44 (Crime Analysis Supplemental Form–M. O. Factors). And the District Court noted it was undisputed that Detective Messerschmidt "had no reason to believe Bowen's crime was a 'gang' crime." App. to Pet. for Cert. 115.[4]

The police's conclusions matched the victim's own account of the attack. Kelly asked police officers to help her move out because Bowen "ha[d] a domestic violence on his record," had "hit [her] once or twice" already, had repeatedly threatened her "You'll never leave me. I'll kill you if you leave me," and she was "planning on breaking up" with him. Record, Doc. 51 (Exh. C), pp. 5–6 (hereinafter Kelly Interview). As Kelly described the confrontation, it was only after she fled to her car in order to leave that Bowen reemerged from their shared apartment with the shotgun and told her "I'm gonna kill your ass right here if you take off," consistent with his prior threats. *Id.*, at 7–8. Every piece of information, therefore, accorded with Detective Messerschmidt's conclusion: The crime was domestic violence that was not gang related.[5]

––––––––

[4] The Court is wrong to imply that courts should not consider "facts outside the affidavit," but within the officers' possession, when assessing qualified immunity. *Ante,* at 10, n. 2. Our precedents make clear that the objective reasonableness of an officer's conduct is judged "in light of clearly established law and the information the officers possessed." *Wilson* v. *Layne*, 526 U. S. 603, 615 (1999). If an officer possesses information indicating that he lacks probable cause to search, and that information was not presented to the neutral magistrate when he approved the search, it is particularly likely that "a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *United States* v. *Leon*, 468 U. S. 897, 922, n. 23 (1984).

[5] To support its theory that Bowen attacked Kelly to keep her silent about his gang activity, the majority relies principally on its claim that Bowen yelled, "'I told you never to call the cops on me bitch!'" *ante,* at 2, citing it no less than five times. See, *ante,* at 11 (Bowen "attempt[ed]

Unlike the Members of this Court, Detective Messer-
schmidt alone had 14 years of experience as a peace of-
ficer, "hundreds of hours of instruction on the dynamics of
gangs and gang trends," received "specialized training in
the field of gang related crimes," and had been "involved
in hundreds of gang related incidents, contacts, and or
arrests." App. 53–54. The Court provides no justification
for sweeping aside the conclusions he reached on the basis
of his far greater expertise, let alone the facts found by the
District Court. We have repeatedly and recently warned
appellate courts, "far removed from the scene," against
second-guessing the judgments made by the police or
reweighing the facts as they stood before the district court.
*Ryburn* v. *Huff,* 565 U. S. —, — (2012) *(per curiam)* (slip
op., at 6–8). The majority's decision today is totally incon-
sistent with those principles.

Qualified immunity analysis does not direct courts to
play the role of crime scene investigators, second-guessing
police officers' determinations as to whether a crime was
committed with a handgun or a shotgun, or whether vio-

---

to murder" Kelly "on the asserted ground that she had 'call[ed] the cops'
on him"); see also *ante,* at 1, 13. Bowen, however, never made that
statement. Though it appears in the warrant application, the words
are Messerschmidt's—taken from his own inaccurate notes of Kelly's
account of the crime. What Kelly actually said during her interview
was that as soon as the police deputies left, Bowen "came out of no-
where talking about, 'Did you call the police on me? You called the
police on me,'" to which Kelly responded "no one called the police on
you . . . . [I]nstead of arguing and fighting with you I just want to get
my shit done." Kelly Interview 7; compare *ibid.* with Record, Doc. 51
(Exh. B), p. 3 (Messerschmidt's narrative of interview with Kelly). Only
after Kelly started to leave did Bowen exclaim "oh it's like that. It's
like that," retrieve a gun, and threaten to shoot her if she left. Kelly
Interview 7–8. That Bowen was "'angry,'" *ante,* at 14, n. 5, because she
had called the sheriff's department for assistance reflected exactly what
Kelly and the police expected at the outset—that Bowen "would give
her a hard time about moving out." App. 38 (sheriff's department
incident report).

lence was gang related or a domestic dispute. Indeed, we have warned courts against asking "whether another reasonable, or more reasonable, interpretation of the events can be constructed five years after the fact." *Hunter* v. *Bryant*, 502 U. S. 224, 228 (1991) *(per curiam).* The inquiry our precedents demand is not whether different conclusions might conceivably be drawn from the crime scene. Rather, it is whether "a reasonably well-trained officer in petitioner's position would have known that his affidavit failed to establish probable cause." *Malley*, 475 U. S., at 345. The operative question in this case, therefore, is whether—given that, as petitioners comprehended, the crime itself was not gang related—a reasonable officer nonetheless could have believed he had probable cause to seek a warrant to search the suspect's residence for all evidence of affiliation not only with the suspect's street gang, but "any Street Gang." He could not.

The Court offers two secondary explanations for why a search for gang-related items might have been justified, but they are equally unpersuasive. First, the majority suggests that such evidence hypothetically "might prove helpful in impeaching Bowen or rebutting various defenses he could raise at trial." *Ante,* at 15. That is a non-starter. The Fourth Amendment does not permit the police to search for evidence solely because it could be admissible for impeachment or rebuttal purposes. If it did, the police would be equally entitled to obtain warrants to rifle through the papers of anyone reasonably suspected of a crime for all evidence of his bad character, Fed. Rule Evid. 404(a)(2)(B)(i), or any evidence of any "crime, wrong, or other act" that might prove the defendant's "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident," Fed. Rule Evid. 404(b)(2). Indeed, the majority's rationale presumably would authorize the police to search the residence of every

member of Bowen's street gang for similar weapons—
which likewise "might [have] prove[d] helpful in impeach-
ing Bowen or rebutting various defenses he could raise at
trial." *Ante*, at 15. It has long been the case, however,
that such general searches, detached from probable cause,
are impermissible. See, *e.g., Go-Bart Importing Co.*, 282
U. S., at 357. By their own admission, however, the offic-
ers were not searching for gang-related indicia to bolster
some hypothetical impeachment theory, but for other
reasons: because "photos sought re gang membership
could be linked with other gang members, evidencing
criminal activity as gang affiliation is an enhancement to
criminal charges." App. 181; see also *id.,* at 145. That
kind of fishing expedition for evidence of unidentified
criminal activity committed by unspecified persons was
the very evil the Fourth Amendment was intended to
prevent.

Finally, the Court concludes that "even if this were
merely a domestic dispute, a reasonable officer could still
conclude that gang paraphernalia found at the Millenders'
residence would aid in the prosecution of Bowen by, for
example, demonstrating Bowen's connection to other
[unspecified] evidence found there." *Ante,* at 15. That is
difficult to understand. The police were well aware before
obtaining a warrant that "other persons associated with
the home, the Millender family members, were active
Mona Park Crip gang members." App. 28. Simply finding
gang-related paraphernalia, therefore, would have done
little to establish probable cause that particular evidence
found in the home was connected to Bowen, rather than
any of the several other active gang members who resided
full time at the Millender home.[6] Moreover, it would have

––––––––––
[6] The Court suggests that even if gang-related evidence would be
inconclusive generally, evidence bearing Bowen's particular gang mon-
iker could have demonstrated Bowen's connection to the residence.

done nothing to establish that Bowen had committed the non-gang-related crime specified in the warrant.[7]

## B

The Court also errs by concluding that petitioners could have reasonably concluded that they had probable cause to search for all firearms. Notably absent from the Court's discussion is any acknowledgment of the actual basis for petitioners' search. The police officers searched for all firearms not for the reasons hypothesized by the majority, but because they determined that "[v]alid warrants commonly allow police to search for 'firearms and ammunition,'" and that "[h]ere, any caliber of shotgun or receipts would show possession of and/or purchase of guns." *Id.*, at 144, 180–181; see also Brief for Appellant in No. 07–55518 (CA9), p. 41 (hereinafter CA9 Brief). It is small wonder that the District Court found these arguments "nonsensical and unpersuasive." App. to Pet. for Cert. 157. It bears repeating that the Founders adopted the Fourth Amendment to protect against searches for evidence of unspecified crimes. And merely possessing other firearms is not a crime at all. See generally *District of Columbia* v. *Heller*, 554 U. S. 570 (2008).[8]

————

But the warrant did not authorize a search for items bearing Bowen's moniker, but rather for items related to "any Street Gang," including countless street gangs of which Bowen was not a member. App. 52. Even under the Court's interpretation, therefore, the warrant was hopelessly overbroad and invalid.

[7]The police also could not search for gang-related evidence for its own sake. Mere membership in a gang is not a crime under California law. See *People* v. *Gardeley*, 14 Cal. 4th 605, 623, 927 P. 2d 713, 725 (1996).

[8]Although the Court recites additional facts about Bowen's background and arrest record, *ante,* at 2–3, none of these facts were disclosed to the magistrate. The police cannot rationalize a search *post hoc* on the basis of information they failed to set forth in their warrant application to a neutral magistrate. Rather, "[i]t is elementary that in passing on the validity of a warrant, the reviewing court may consider *only* information brought to the magistrate's attention." *Aguilar* v.

By justifying the officers' actions on reasons of its own invention, the Court ignores the reasons the officers actually gave, as well as the facts upon which this case was decided below. The majority's analysis—akin to a rational-basis test—is thus far removed from what qualified immunity analysis demands. Even if the police had searched for the reasons the Court proposes, however, I still would find it inappropriate to afford them qualified immunity.

The Court correctly recognizes that to satisfy the Fourth Amendment the police were required to demonstrate probable cause that (1) other firearms could be found at the Millenders' residence; and (2) such weapons were illegal or were "'possess[ed] . . . with the intent to use them as a means of committing a public offense.'" *Ante,* at 12 (quoting Cal. Penal Code Ann. §1524(a)(3) (West 2011)). The warrant failed to establish either.

The majority has little difficulty concluding that because Bowen fired one firearm, it was reasonable for the police to conclude not only that Bowen must have possessed others, but that he must be storing these other weapons at his 73-year-old former foster mother's home.[9] Again, however, this is not what the police actually concluded, as Detective Messerschmidt's deposition makes clear.

"Q: Did you have any reason to believe there would be

_____

*Texas*, 378 U. S. 108, 109, n. 1 (1964); see also *United States* v. *Jacobsen*, 466 U. S. 109, 112 (1984). Likewise, a police officer cannot obtain qualified immunity for searching pursuant to a warrant by relying upon facts outside that warrant, as evinced by *Malley*'s focus on "whether a reasonably well-trained officer in petitioner's position would have known that his *affidavit* failed to establish probable cause." *Malley* v. *Briggs*, 475 U. S. 335, 345 (1986) (emphasis added).

[9] The majority ignores that Bowen retrieved the shotgun that he fired from the apartment he shared with Kelly, not the Millenders' home. Kelly provided no indication that Bowen possessed other guns or that he stored them at his former foster mother's home.

any automatic weapons in the house?

"A: No.

"Q: Did you have any reason to believe there would be any hand guns in the house?

"A: I wasn't given information that there were."  Deposition 120.

Undaunted, the majority finds that a well-trained officer could have concluded on this information that he had probable cause to search for "[a]ll hand guns, . . . [a]ll caliber of ammunition, miscellaneous gun parts, gun cleaning kits, holsters which could hold or have held any caliber handgun being sought," and "[a]ny receipts or paperwork, showing the purchase, ownership, or possession of the handguns being sought."  App. 52.  That is puzzling.  If any aspect of the Fourth Amendment is clearly established, it is that the police cannot reasonably search—even pursuant to a warrant—for items that they do not have "any reason to believe" will be present.  The Court's conclusion to the contrary simply reads the "probable cause" requirement out of the Fourth Amendment.

Even assuming that the police reasonably could have concluded that Bowen possessed other guns and was storing them at the Millenders' home, I cannot agree that the warrant provided probable cause to believe any weapon possessed in a home in which 10 persons regularly lived—none of them the suspect in this case—was either "contraband or evidence of a crime."  *Ornelas* v. *United States,* 517 U. S. 690, 696 (1996).  The warrant set forth no specific facts or particularized explanation establishing probable cause to believe that other guns found in the home were connected to the crime specified in the warrant or were otherwise illegal.[10]  While the Court hypothesizes

———————

[10]Augusta Millender was a 73-year-old grandmother living in a dangerous part of Los Angeles.  It would not have been unreasonable to imagine that she validly possessed a weapon for self-defense, as turned

that the police could have searched for all firearms to uncover evidence of yet unnamed crimes, *ante,* at 11–12, the warrant specified that the police were investigating one particular crime—"an assault with a deadly weapon." App. 55. And the police officers confirmed that their search was targeted to find the gun related to "the crime at issue." CA9 Brief 42; see also App. 52 (obtaining authorization to search for "*the item* being sought and or believed to be evidence in the case being investigated on this warrant" (emphasis added)).

The police told the Ninth Circuit that they searched for all firearms not because, as the majority hypothesizes, "there would be additional illegal guns among others that Bowen owned," *ante,* at 11–12, but on the dubious theory that "Kelly could have been mistaken in her description of the gun." App. to Pet. for Cert. 20–21. The Ninth Circuit properly dismissed that argument as carrying "little force." *Id.,* at 21. Its finding is unimpeachable, given that Kelly presented the police with a photograph of Bowen holding the specific gun used in the crime, and the police, the victim, and a witness to the crime all identified the gun as a sawed-off shotgun. See *id.,* at 20, 21, 24, 28.

Finally, the majority suggests that the officers could have reasonably believed that seizure of all firearms at the Millenders' residence was justified because those weapons might be possessed by Bowen "'with the intent to use them as a means of committing a public offense.'" *Ante,* at 12. But the warrant specified that the police sought only the shotgun used in this crime for that purpose. See App. 59 (statement of probable cause) ("Your Affiant also believes that the items sought will be in the possession of Jerry Ray Bowen and the recovery of *the weapon* could be invaluable in the successful prosecution of the suspect involved in this case, and the curtailment of further

———————
out to be the case.

crimes being committed" (emphasis added)).

## II

The Court also finds error in the Court of Appeals' failure to find "pertinent" the fact that the officer sought approval of his warrant from a magistrate.[11] *Ante,* at 18. Whether Detective Messerschmidt presented his warrant application to a magistrate surely would be "pertinent" to demonstrating his subjective good faith.[12] But qualified immunity does not turn on whether an officer is motivated by good intentions or malice, but rather on the "objective reasonableness of an official's conduct." *Harlow* v. *Fitzgerald*, 457 U. S. 800, 818 (1982).

The majority asserts, without citation, that the magistrate's approval is relevant to objective reasonableness. That view, however, is expressly contradicted by our holding in *Malley* v. *Briggs*, 475 U. S. 335. There, we found that a police officer is not "entitled to rely on the judgment of a judicial officer in finding that probable cause exists and hence issuing the warrant," and explained that "[that] view of objective reasonableness is at odds with our development of that concept in *Harlow* and [*United States* v. *Leon*, 468 U. S. 897 (1984)]." *Id.,* at 345. The appropriate qualified immunity analysis, we held, was not whether an

––––––––––

[11] Under California law, magistrates are the officials responsible for issuing search warrants. Cal. Penal Code Ann. §1523 (West 2011).

[12] To be clear, no one suggests petitioners acted with malice or intended to be "misleading in omitting . . . facts," *ante,* at 10, n. 2, that illustrate why it would have been objectively unreasonable to search for the reasons the Court proposes. It is hardly surprising, for instance, that Detective Messerschmidt did not include in his affidavit further facts affirming that the crime was not gang related, given that he did not believe the crime was gang related and did not search for gang-related material for that reason. See *supra,* at 7–8. The affidavit and warrant were perfectly consistent with the officers' stated reasons for their search—just not with the Court's own theories.

officer reasonably relied on a magistrate's probable cause determination, but rather "whether a reasonably well-trained officer in petitioner's position would have known that his affidavit failed to establish probable cause and that he should not have *applied* for the warrant." *Ibid.* (emphasis added).[13]  In such a case, "the officer's application for a warrant [would] not [be] objectively reasonable, because it create[s] the unnecessary danger of an unlawful arrest." *Ibid.*  When "no officer of reasonable competence would have requested the warrant," a "magistrate [who] issues the warrant [makes] not just a reasonable mistake, but an unacceptable error indicating gross incompetence or neglect of duty." *Id.,* at 346, n. 9.  In such cases, "[t]he officer . . . cannot excuse his own default by pointing to the greater incompetence of the magistrate." *Ibid.*

In cases in which it would be not only wrong but unreasonable for any well-trained officer to seek a warrant, allowing a magistrate's approval to immunize the police officer's unreasonable action retrospectively makes little sense.  By motivating an officer "to reflect, before submitting a request for a warrant, upon whether he has a reasonable basis for believing that his affidavit establishes probable cause," we recognized that our qualified immunity precedents had the "desirable" effect of "reduc[ing] the likelihood that the officer's request for a warrant will be premature," leading to "a waste of judicial resources" or "premature arrests." *Id.,* at 343.  To the extent it proposes to cut back upon *Malley*, the majority will promote the opposite result—encouraging sloppy police work and exacerbating the risk that searches will not comport with the requirements of the Fourth Amendment.

--------

[13]Two Justices wrote separately, disagreeing with the majority because they believed that "substantial weight should be accorded the judge's finding of probable cause." *Malley*, 475 U. S., at 346 (Powell, J., joined by Rehnquist, C. J., concurring in part and dissenting in part).

The Court also makes much of the fact that Detective Messerschmidt sent his proposed warrant application to two superior police officers and a district attorney for review. Giving weight to that fact would turn the Fourth Amendment on its head. This Court made clear in *Malley* that a police officer acting unreasonably cannot obtain qualified immunity on the basis of a neutral magistrate's approval. It would be passing strange, therefore, to immunize an officer's conduct instead based upon the approval of other police officers and prosecutors.[14] See *Johnson* v. *United States*, 333 U. S. 10, 14 (1948) (opinion of Jackson, J.) ("When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent"). The effect of the Court's rule, however, is to hold blameless the "plainly incompetent" action of the police officer seeking a warrant because of the "plainly incompetent" approval of his superiors and the district attorney. See *ante,* at 16–18; see also *ante,* at 3–4 (opinion of KAGAN, J.). Under the majority's test, four wrongs apparently make a right. I cannot agree, however, that the "objective legal reasonableness of an official's acts," *Harlow*, 457 U. S., at 819, turns on the number of police officers or prosecutors who improperly sanction a search that violates the Fourth Amendment.

### III

Police officers perform a difficult and essential service to society, frequently at substantial risk to their personal

———————

[14] In the famous case of *Wilkes* v. *Wood*, Lofft 1, 98 Eng. Rep. 489 (C. P. 1763), one of the seminal events informing the Framers' development of the Fourth Amendment, the Undersecretary of State who searched the home of John Wilkes pursuant to a general warrant was subjected to monetary damages notwithstanding that his superior, Lord Halifax, issued the warrant. See *Boyd* v. *United States*, 116 U. S. 616, 626 (1886).

safety. And criminals like Bowen are not sympathetic figures. But the Fourth Amendment "protects all, those suspected or known to be offenders as well as the innocent." *Go-Bart Importing Co.*, 282 U. S., at 357. And this Court long ago recognized that efforts "to bring the guilty to punishment, praiseworthy as they are, are not to be aided by the sacrifice of those great principles established by years of endeavor and suffering which have resulted in their embodiment in the fundamental law of the land." *Weeks* v. *United States*, 232 U. S. 383, 393 (1914).

Qualified immunity properly affords police officers protection so long as their conduct is objectively reasonable. But it is not objectively reasonable for police investigating a specific, non-gang-related assault committed with a particular firearm to search for all evidence related to "any Street Gang," "photographs . . . which may depict evidence of criminal activity," and all firearms. The Court reaches a contrary result not because it thinks that these police officers' stated reasons for searching were objectively reasonable, but because it thinks different conclusions might be drawn from the crime scene that reasonably might have led different officers to search for different reasons. That analysis, however, is far removed from qualified immunity's proper focus on whether *petitioners* acted in an objectively reasonable manner.

Because petitioners did not, I would affirm the judgment of the Court of Appeals.